

U.S. BANKRUPTCY COURT

NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK

THE DATE OF ENTRY IS

ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 2, 2015**

_____
**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| HARDEMAN COUNTY HOSPITAL | § | CASE NO. 13-70103-HDH9 |
| DISTRICT d/b/a HARDEMAN COUNTY | § | |
| MEMORIAL HOSPITAL | § | Chapter 9 |
| Debtor. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
ORDER CONFIRMING PLAN OF ADJUSTMENT**

On October 21, 2015, the Court conducted the Confirmation Hearing on the *Amended Plan of Adjustment* (Doc. # 283, the "**Plan**")[1] filed by Hardeman County Hospital District d/b/a Hardeman County Memorial Hospital (the "**Debtor**" or the "**Hospital**"). The court-approved Plan Summary was appropriately transmitted to Creditors, and the Court finds that due and proper notice has been given of the Confirmation Hearing and the deadlines and procedures for voting and for filing

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed in the Plan.

objections to the Plan. The objection (Doc. # 291) filed by TMJMF Holdings, L.P. ("**TMJMF**"), the objection (Doc. # 299) filed by InterEXPO Ltd. ("**InterEXPO**"), and any other objections or responses to Confirmation of the Plan that (a) have not been withdrawn, waived, or settled prior to the entry of the Order Confirming Plan or (b) are not cured by the relief granted herein, are overruled on the merits, and all withdrawn objections or responses each are hereby deemed withdrawn with prejudice. Upon the record of the Confirmation Hearing, the Court makes these Findings of Fact and Conclusions of Law (the "Findings and Conclusions"):

**The Debtor**

1.     Hardeman County Hospital District, which does business under the name Hardeman County Memorial Hospital, is the county hospital serving Quanah, Texas and Hardeman County.

2.     The Hospital is designated as a critical-access licensed 24-bed general acute-care facility and is also designated as a Trauma Level 4 facility. Its services include acute medical care, out-patient services, rehabilitation services, swing-bed program, clinic services, and intensive outpatient mental health services for senior adults. The Hospital is the primary and acute care center for Quanah, Hardeman County, and portions of the surrounding counties. The Hospital presently has partnered with the town of Crowell in neighboring Foard County to be its medical provider for its rural health clinic.

3.     Hardeman County Hospital District is a taxing district, and thus is a political subdivision, of the State of Texas. It was created by an act of the Texas

Legislature in 1979. Its enabling statute has been codified by the Legislature and is found in the Special District Local Laws Code at Chapter 1038. TEX. SPEC. DIST. LOCAL LAWS CODE § 1038.001 et seq. The District operates solely with the taxes it raises by levy on properties located within its boundaries and the revenues of its medical and healthcare services and operations. The enabling legislation provides that "[t]he legislature may not make a direct appropriation for the construction, maintenance, or improvement of a district facility." *Id.* § 1038.006. Accordingly, "the district has full responsibility for: (1) operating all hospital facilities; and (2) providing medical and hospital care for the district's needy inhabitants." *Id.* § 1038.101.

4.     The communities of Quanah, Hardeman County, and Foard County depend on the Hospital in multiple ways. As noted, it maintains an emergency room 24 hours a day, seven days a week. This emergency-room availability is critically important to the employers of the communities, such as the gypsum wallboard manufacturing plant that employs 130 people, the school district that is the largest employer in the county, as well as all residents of all ages of the communities served by the Hospital as well as visitors and those needing medical services while traveling through, such as car crash victims. The economic, social, and community-building and -bonding effects of the Hospital cannot be calculated in mere dollars and cents.

5.     The dollars and cents are of course important. The Hospital must match its expenditures to its revenues and operate within its means. The Hospital

was in serious financial distress by the end of 2012 and insolvent in early 2013. As a result, its Board of Directors voted on March 21, 2013 to file a petition under Chapter 9, the municipal bankruptcy provisions of the federal Bankruptcy Code, as the best available means of restructuring and revivifying itself in order to successfully continue its mission to provide healthcare services to its communities including needy inhabitants into the future. The Court entered the *Order for Relief* (Doc. # 24) on March 27, 2013.

6.      The Plan, which is dated, as originally filed by the Debtor, August 14, 2015 (Doc. # 269), and as amended, September 4, 2015 (Doc. #280),[2] is intended to pay secured claims in full, to provide a fair distribution to Unsecured Creditors, to assume and continue more than 200 executory contracts and leases that are beneficial to the Debtor, to maintain its facilities and its corps of dedicated employees and healthcare providers, and to accomplish its statutory mission within the communities it serves. The *Second Amended Disclosure Statement for the Plan of Adjustment* (Doc. # 288) and the evidence presented at the Confirmation Hearing have detailed the steps and work that have gone into rehabilitating the Hospital during the postpetition era. Confirmation of the Plan will be the final step in the rehabilitation and adjustment of debts of the Hospital and its repositioning to continue its mission well out into the future.

---

[2] For administrative reasons, an identical version of the Plan was also docketed by the Court at Doc. # 283.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF**
**ORDER CONFIRMING PLAN OF ADJUSTMENT**                                    Page 4 of 44

**Jurisdiction and Venue**

7. This Court has jurisdiction over this Chapter 9 case and this matter under 28 U.S.C. § 1334(a)&(b), and venue is proper under 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and (O), and this Court has authority to enter a final order determining whether the Plan complies with the Bankruptcy Code and should be confirmed.[3]

8. Because it is a political subdivision of the State of Texas that has been specifically authorized by the Texas Legislature to seek relief under Chapter 9,[4] the

---

[3] The Supreme Court's decision in *Stern v. Marshall*, 564 U.S. __, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011), *pet. for reh'g denied* 132 S. Ct. 56 (2011), which limited the constitutional authority of bankruptcy courts to enter final orders, does not prevent this Court from entering a final order confirming the Plan. *See Wellness Int'l Network, Ltd. v. Sharif*, __ U.S. __, 135 S. Ct. 1932, 1946-47 (2015) (the limitation in *Stern* on the entry of final orders by bankruptcy courts is "narrow"). This Bankruptcy Court has authority, notwithstanding *Stern*, to adjudicate on a final basis whether the Plan should be confirmed under Bankruptcy Code § 943(b), which incorporates many of the requirements of Bankruptcy Code § 1129. "State law has no equivalent to this statute[, and,] therefore, the facts in this case are distinguishable from those in *Stern*, which involved only state law." *In re Carlew*, 469 B.R. 666, 672 (Bankr. S.D. Tex. 2012); *see also In re Thalmann*, 469 B.R. 677, 680-81 (Bankr. S.D. Tex. 2012); *In re Whitley*, 2011 WL 5855242, at *4 (Bankr. S.D. Tex. Nov. 21, 2011). Indeed, *Stern* "did not purport to limit bankruptcy courts' authority to adjudicate other 'core proceedings,' such as confirmation of a plan under § 157(b)(2)(L)." *In re Land Res., LLC*, 505 B.R. 571, 581 n.7 (M.D. Fla. 2014). *See also In re Lower Bucks Hosp.*, 471 B.R. 419, 448, n.45 (Bankr. E.D. Pa. 2012) ("If a bankruptcy court lacks subject matter jurisdiction over plan confirmation, it is hard to conceive of any matter that would fall within bankruptcy subject matter jurisdiction."). As one Texas Bankruptcy Court stated in the chapter 13 context, "there is absolutely no state law involved in confirmation of a [] plan, or modification of such a plan"; thus, "*Stern* is entirely inapplicable[,] and this Court has the constitutional authority to sign a final order. . . ." *In re Hill*, 2011 WL 6936357, at *7 (Bankr. S.D. Tex. Dec. 30, 2011). Because the narrow strictures imposed upon bankruptcy courts by *Stern* do not apply to confirmation of a plan, this Court has the constitutional authority to enter a final order confirming the Plan this Case.

[4] Texas statutory law provides:

> Tex. Local Gov't Code § 140.001. Relief Under Federal Bankruptcy Laws for Municipality, Taxing District, or Other Political Subdivision
> (a) A municipality, taxing district, or other political subdivision that is subject to this section may proceed under all federal bankruptcy laws intended to relieve municipal indebtedness.
> (b) A municipality is subject to this section if it has the power to incur indebtedness through the action of its governing body. A taxing district or other political subdivision is subject to this section if it has the power to incur indebtedness either

Debtor is a proper municipal debtor under Bankruptcy Code § 109. Further, the Debtor is the proper proponent of the Plan under Bankruptcy Code § 941. A debtor in a Chapter 9 Case has the exclusive right to propose a plan of adjustment. *See* COLLIER ON BANKRUPTCY ¶ 941.02 (16th ed.) (hereinafter "COLLIER") (citing *Ashton v. Cameron Cty. Water Improvement Dist. No. 1*, 298 U.S. 513 (1936) and *U.S. v. Bekins*, 304 U.S. 27 (1938), both construing the Tenth Amendment to the United States Constitution as requiring that a municipal debtor be left in complete control of its political and governmental affairs).

### Brief History of Chapter 9

9.      Chapter 9 was added to the national bankruptcy law during the Great Depression. Prior to adoption of the Bankruptcy Code, it was generally called "Chapter IX." From its earliest days, it has afforded restructuring relief to political subdivisions of states that specifically authorize their political subdivisions to file petitions to commence cases in bankruptcy courts. The purpose of Chapter 9 is beneficent for both debtors and creditors. COLLIER speaks of "the broad remedial purpose of chapter 9," COLLIER ¶ 900.02[2][b], and noted commentators who have focused on Chapter 9 have observed:

> [I]t is not always possible to pay, and it is in the interest of all *(creditors as well as debtors)* to reach an accommodation when this eventuality occurs. This may require coercion of unwilling parties, since *individual creditors may find it in their interest to resist a*

---

through the action of its governing body or through that of the county or municipality in which it is located.

(c) The officials and governing body of the municipality, taxing district, or other political subdivision may adopt all proceedings and take any action necessary or convenient to fully avail the entity of the federal bankruptcy laws.

> *solution even when it is in the interest of the creditors as a whole.* This is the "collective action" problem. . . [B]ankruptcy [is] the solution to the collective action problem . . . .

Michael W. McConnell & Randal C. Picker, *When Cities Go Broke: A Conceptual Introduction to Municipal Bankruptcy*, 60 U. Chi. L. Rev. 425, 426 (1993) (emphasis added).

10.    The Debtor has limned the history of Chapter 9 in its Confirmation Hearing Brief (Doc. #302), demonstrating that its early history has deep Texas roots. The Debtor's case and its Plan fit well within that tradition.

## Standards for Confirmation Under Bankruptcy Code § 943

11.    A Chapter 9 plan proponent has the burden to prove the requirements for confirmation of a plan by preponderance of the evidence. *In re City of Detroit*, 524 B.R. 147, 202 (Bankr. E.D. Mich. 2014); *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 855-56 (Bankr. D.S.C. 2012); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31 (Bankr. D. Colo. 1999).

12.    The Debtor has carried its burden of proof for Confirmation.   The evidentiary record of the Confirmation Hearing and the provisions of the Plan support this Court's findings of fact and conclusions of law.

13.    **Bankruptcy Code § 943(b)(1)**. In accordance with Bankruptcy Code § 943(b)(1), the Plan complies with the provisions of the Bankruptcy Code made applicable to Chapter 9 cases by Bankruptcy Code §§ 103(f) and 901. Specifically:

(a) **Bankruptcy Code § 1122**. Article IV of the Plan classifies each Claim against the Debtor into a Class containing only substantially similar Claims as mandated by § 1122(a) of the Bankruptcy Code. "The application of § 1122 in chapter 9 cases should be essentially the same as in chapter 11 cases." COLLIER ¶ 901.04[35]. *See also Supreme Forest Woodmen Circle v. City of Belton*, 100 F.2d 655, 657 (5th Cir. 1938) (non-negotiable warrants may be placed in the same class of a Chapter IX plan as negotiable bonds). The legal rights under applicable law of each Holder of Claims within each Class under the Plan are substantially similar in nature and character to the legal rights of all other Holders of Claims within each Class.

"Under the Bankruptcy Code, classes must contain 'substantially similar' claims, but similar claims can be separated into different classes for 'good business reasons.'" *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 251 (5th Cir. 2009); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1281 (5th Cir. 1991). Further, "'[s]ubstantially similar claims must be classified together unless some reason, other than gerrymandering, exists for separating them.'" *In re The Heritage Org., L.L.C.*, 375 B.R. 230, 298 (Bankr. N.D. Tex. 2007).

The Plan does not separately classify any Claims for the purpose of gerrymandering favorable votes with respect to the Plan. The four classes of secured claims, Classes 1 through 4, are based on the separate collateral, or in the instance of Class 4, the unique setoff right, of each of the creditors placed in each of such

Classes. The separation of General Unsecured Creditors into two classes, Class 5 for General Unsecured Claims and Class 6 for Convenience Claims, which is statutorily authorized by Bankruptcy Code § 1122(b) for administrative convenience, is proper in all respects. *See In re City of Detroit*, 524 B.R. at 202 (approving convenience class of unsecured claims of $25,000 or less for administrative convenience).

(b) **Bankruptcy Code § 1123(a)(1)-(5).** In accordance with Bankruptcy Code § 1123(a)(1), Article IV of the Plan properly classifies all Claims that require classification, and the classifications in the Plan comply with Bankruptcy Code § 1122, as described above. Bankruptcy Code § 1123(a)(2) is inapplicable because there are no unimpaired classes under the Plan. Pursuant to Bankruptcy Code § 1123(a)(3), Article IV of the Plan properly identifies and describes the treatment of each Class of Claims that is "impaired" under the Plan within the meaning of Bankruptcy Code § 1124. See *Western Real Estate Equities, L.L.C., v. Village at Camp Bowie I, L.P. (In re Village at Camp Bowie I, L.P.)*, 710 F.3d 239, 247-48 (5th Cir. 2013).

As required by Bankruptcy Code § 1123(a)(4), the Plan provides the same treatment for each Claim of a particular Class (and here no Holder of such a Claim has agreed to less favorable treatment). Bankruptcy Code § 1123(a)(5) requires that a plan provide adequate means for its implementation, and the Plan does so in its provisions specified in Article VI of the Plan entitled "Means for Implementation of this Plan," Article VII of the Plan entitled "Plan Administration," and Article VIII of the Plan entitled "Provisions Governing Distributions."

(c) **Bankruptcy Code § 1123(b)**. Bankruptcy Code § 1123(b) sets forth permissible provisions that may be contained in a plan. In accordance with Bankruptcy Code § 1123(b)(1), Article IV of the Plan impairs each Class of Claims. Under Bankruptcy Code § 1123(b)(2), Article XI of the Plan provides for the assumption or rejection of the executory contracts and unexpired leases of the Debtor that have not been previously assumed or rejected during the Case pursuant to Bankruptcy Code § 365. Per Bankruptcy Code § 1123(b)(3), the Plan provides for the settlement, adjustment, or retention of Claims belonging to the Debtor. In compliance with Bankruptcy Code § 1123(b)(5), the Plan modifies, as specified therein, the rights of Holders of Secured Claims and of Holders of General Unsecured Claims. In accordance with Bankruptcy Code § 1123(b)(6), the Plan includes additional appropriate provisions that are not inconsistent with the Bankruptcy Code, including certain discharge, injunction, exculpation, and settlement and release provisions described elsewhere in these findings and conclusions.

(d) **Bankruptcy Code § 1123(d)**. As authorized by Bankruptcy Code § 1123(d), the Plan proposes to cure defaults under assumed Executory Contracts and Unexpired Leases. The cure amounts attributable to any such defaults have been determined by the Debtor and set forth on Exhibit A to the Plan and are in accordance with the underlying agreements and applicable nonbankruptcy law.

(e) **Bankruptcy Code § 1128**. Bankruptcy Code § 1128 requires the Court to hold a hearing confirm a plan, which the Court did on October 21, 2015,

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
ORDER CONFIRMING PLAN OF ADJUSTMENT**

after appropriate notice and opportunity for objections by Creditors and other parties in interest in compliance with the Bankruptcy Code and Bankruptcy Rules.

(f) **Bankruptcy Code § 1129(a)(2)**. The Debtor has complied with all applicable provisions of the Bankruptcy Code with respect to the Plan and the solicitation of acceptances or rejections thereof. In particular, the Plan and the Debtor's solicitation of acceptances or rejection of that Plan complies with the requirements of Bankruptcy Code §§ 1125 and 1126(a)-(c) and (e)-(g) (made applicable in Chapter 9 cases by Bankruptcy Code § 901) as follows:

(i) **Bankruptcy Code § 1125(b)**. As detailed in the Certificate of Service (Doc. # 293) the Debtor complied with Bankruptcy Code § 1125(b) by transmitting to holders of Allowed Claims entitled to vote a copy of the court-approved Disclosure Statement and Plan Summary, and other Court-approved notices.

(ii) **Bankruptcy Code § 1125(c)**. In compliance with Bankruptcy Code § 1125(c), the Debtor transmitted the same Disclosure Statement to all Holders of Claims within each Class under the Plan.

(iii) **Bankruptcy Code § 1125(e)**. In accordance with Bankruptcy Code § 1125(e), the Debtor has solicited acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

(iv) **Bankruptcy Code § 1126(a)**. The Holders of allowed Claims were given the opportunity to vote to accept or reject the Plan using ballots

and voting procedures previously approved by this Court as required by Bankruptcy Code § 1126(a),

(v) **Bankruptcy Code § 1126(b)**. Bankruptcy Code § 1126(b) is inapplicable to the Plan.

(vi) **Bankruptcy Code § 1126(c)**. The Debtor, whose counsel was tasked to receive the acceptances or rejections of the Plan, has timely and properly filed and served a ballot certification that identifies the amount and number of allowed claims of each class accepting or rejecting the Plan and the amount of allowed interests of each class accepting or rejecting the Plan. The following Classes of Claims voted, by requisite majorities of at least two-thirds in amount and more than one-half in number of those Ballots cast, to accept the Plan:

| | |
|---|---|
| Class 1–FNB Secured Claim | Yes: 1 Vote = 100%; $817,315.47 = 100% |
| Class 2 –TRB Secured Claim | Yes: 1 Vote = 100%; $240,000.00 = 100% |
| Class 3 –CSB Secured Claim | Yes: 1 Vote = 100%; $6,403.41= 100% |
| Class 4 – Cardinal Health Secured Claim | Yes: 1 Vote = 100%; $1,752.33 = 100% |
| Class 5 –General Unsecured Claims | Yes: 19 Votes = 76%; $287,254.88 = 46%<br>No: 6 Votes = 24%; $338,425.48 = 54% |
| Class 6 – Allowed Convenience Claims | Yes: 12 Votes = 100%; $34,945.06 = 100% |

(vii) **Bankruptcy Code § 1126(f)**. Bankruptcy Code § 1126(f) is inapplicable as all Classes of Claims are impaired under the Plan.

(viii)    **Bankruptcy Code § 1126(g)**. Bankruptcy Code § 1126(g) is inapplicable because all Classes of Claims are to receive or retain some kind of property under the Plan on account of such Claims.

(g)    **Bankruptcy Code § 1129(a)(3)**. Bankruptcy Code § 1129(a)(3) imposes on a plan proponent a duty to propose its plan in good faith and not by any means forbidden by law. TMJMF has objected to the Debtor's good faith in proposing its Plan. However, in the Confirmation Hearing, the Debtor presented ample evidence of good faith and the avoidance of any means forbidden by law. "Generally, '[where] [a] plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied.'" *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) (quoting *In re T-H New Orleans P'ship*, 116 F.3d 790, 802 (5th Cir. 1997)).

In the present case, the Plan has not been proposed by any means forbidden by law, and the Plan has been proposed by the Debtor in good faith, with honesty, sincerity, good intentions, and the reasonable expectations that an adjustment of the Debtor's debts and an operational restructuring of the Debtor can and should be effectuated in accordance with the purpose of Chapter 9. Moreover, the Plan is feasible. The Plan and the treatment of Claims, and the process by which the Debtor has sought Confirmation, are fundamentally fair to the Debtor's Creditors.

The Plan is intended to achieve two primary objectives: first, the continued operation of Hardeman County Memorial Hospital and its related rural health

clinics in order to provide medical care to the residents of Hardeman County, including its needy inhabitants, which is its statutory mission under Article IX, Section 9 of the TEXAS CONSTITUTION, § 286.073 of the TEXAS HEALTH & SAFETY CODE, and § 1038.101 of the SPECIAL DISTRICT LOCAL LAWS CODE, and, second, the satisfaction of Creditor Claims in accordance with the provisions of a Plan from available funds while preserving other funds needed for Hospital and clinic operations and for necessary improvements and maintenance of the Hospital and clinic facilities now and into the future. Both of these goals meet the objective and purpose of Chapter 9 of the Bankruptcy Code, which is to permit a financially distressed public entity to adjust its debts in light of the fact that it is an operating municipality, which, by its nature, is not subject to liquidation. *See* COLLIER ¶ 900.01[1]. As one bankruptcy case explained, the legislative purpose underlying Chapter 9 "is to allow an insolvent municipality to restructure its debts in order to continue to provide public services." *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999).

Further evidence of the Debtor's good faith in proposing the Plan to adjust its debts is the Debtor's performance and activities during this Case. The Debtor has complied with all requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules. The U.S. Trustee appointed a Patient Ombudsman under Bankruptcy Code § 333, Marian Jean Small, and she has inspected the Hospital and its patient care regularly during the Case and has filed her reports with the Court reflecting that the Debtor has done a good job of patient care.  The

Debtor has submitted willingly to governmental audits and obtained its own audit of the financial statements for 2013. The Debtor's Board of Directors has continued to hold public meetings each month during the Case. The Debtor has conducted itself honestly and openly at all times.

The Debtor's good faith is further shown in reaching negotiated settlements with many of its Creditors during the Case, including with the litigation claimants TMJMF and InterEXPO, and the fact that the Plan is supported by the all of the Debtor's secured Creditors, including its primary and secondary lenders, with whom the Debtor has worked closely throughout the Case and negotiated the Plan treatments, as well as by a large proportion of its General Unsecured Creditors.

In finding that the Plan has been proposed in good faith and not by any means forbidden by law, the Court has considered the totality of the circumstances of this Chapter 9 Case as well as the testimony at the Confirmation Hearing. As in the *City of Detroit* Chapter 9 case, this Court finds that the Plan has been proposed in good faith because it "was filed to achieve a result consistent with the objectives and purposes of chapter 9—to adjust the [Hospital District]'s debts so that it can reinvest in itself, address its operational problems, recover its ability to provide adequate municipal services, and maintain long-term solvency." *In re City of Detroit*, 524 B.R. 147, 251 (Bankr. E.D. Mich. 2014).

At the Confirmation Hearing, TMJMF Holdings, LP ("**TMJMF**"), an objector to the Plan and holder of the largest Class 5 General Unsecured Claim, complained that the Debtor did not pursue all claims against all possible parties; however, the

Debtor believes its major claims to have been against the objecting parties, including TMJMF, and those claims have been settled during this Case. Furthermore, at the Confirmation Hearing, the Chairman of the Board of the Debtor testified credibly that the Board received professional advice not to pursue additional claims. Moreover, the Debtor's financials suggest that the Debtor lacks funds to pursue extensive post-confirmation litigation and any such funds expended would be at the expense of operations of the Hospital. The fact that Debtor's counsel has provided the bulk of its work in this Case on a pro bono basis further supports the conclusion that the Debtor lacks funds to pursue litigation. The objectors' allegations of lack of good faith under Bankruptcy Code § 1129(a)(3) are not well taken.

(h) **Bankruptcy Code § 1129(a)(6)**. In accordance with both Bankruptcy Code §§ 1129(a)(6) and 943(b)(6), Article VI of the Plan provides that, as a condition to effectiveness of the Plan, the Debtor shall have obtained any regulatory or electoral approvals necessary under applicable nonbankruptcy law in order to carry out any provision of the Plan, or such Plan provision is expressly conditioned upon such approval being obtained. The evidence presented is that no such approvals are necessary.

(i) **Bankruptcy Code § 1129(a)(8)**. Based on the results of balloting as set forth above, Bankruptcy Code § 1129(a)(8) is not satisfied because one of the six classes of impaired classes has rejected the Plan, namely, Class 5, General Unsecured Creditors.

(j)    **Bankruptcy Code § 1129(a)(10)**. The Plan has been accepted by multiple Impaired Classes of Claims that are entitled to vote on the Plan, without including any acceptance of the Plan by any insider, as indicated in section 13(g)(6) of these findings and conclusions.

(k)    **Bankruptcy Code § 1129(b)(1) & (b)(2)(A)&(B)**. Class 5, General Unsecured Creditors, has voted to reject the Plan due to the requirement that two-thirds in amount voting to accept the Plan not being met. However, while Bankruptcy Code § 1129(a)(8) is not satisfied, the Plan may be crammed under § 1129(b) if the Plan does not unfairly discriminate with respect to each Class of Impaired Claims that has not accepted the Plan and if the Plan is fair and equitable with respect to each such Class.

A determination of whether a plan unfairly discriminates involves consideration of differential treatment as between similarly situated classes and whether the treatment, though different, is fair under the given facts. *See In re Simmons*, 288 B.R. 737, 748 (Bankr. N.D. Tex. 2003) (stating that it is "necessarily inherent in the term 'unfair discrimination' that there may be 'fair' discrimination in the treatment of classes of creditors"). As the Fifth Circuit has held: "A bankruptcy court can permit discrimination when the facts of the case justify it." *Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*, 622 F.2d 872, 879 (5th Cir. 1980). *See generally*, Bruce Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227 (1998). Here the Plan does not unfairly discriminate with respect to Class 5, which is impaired under, and has

not accepted, the Plan. *See In re Adkins*, 2015 WL 2398412, at *1 (Bankr. W.D. La. May 18, 2015) (unfair discrimination test applies only as between treatment of unsecured claimants). Indeed, here there is no unfair discrimination against Class 5 because the only other class containing General Unsecured Claims, Class 6, is statutorily entitled to receive a better percentage treatment than Class 5 due to the administrative convenience of placing small claims into their own class. BANKR. CODE § 1122(b) (made applicable via § 901(a)).

The Plan is also fair and equitable, within the contemplation of Bankruptcy Code § 1129(b)(2)(A) and (B) with respect to Class 5, which is the only the impaired rejecting Class of Claims. In a Chapter 9 case, the fair and equitable requirement has been interpreted to mean that Holders of Claims must receive all they can reasonably expect under the circumstances of the Case. *See* COLLIER ¶ 943.03[1][f][i][B]. Additionally, in determining those reasonable expectations, the district must be allowed to retain adequate revenues to continue operations because a Chapter 9 debtor "cannot be dismantled or liquidated as in ordinary bankruptcy" and "the fair and equitable rule does not prevent a municipal debtor from continuing to operate, even if creditors are not paid in full." *Id.* In a California municipal hospital case, the bankruptcy court held that, because there are no equity holders in a Chapter 9 case, "'the absolute priority rule' embodied by § 1129(b)(2)(B) does not prevent the debtor here from continuing to operate the hospital." *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 458 (Bankr. E.D. Cal. 1999).

In Chapter 9, creditors cannot expect that, in making payments to Creditors under a plan, the Debtor's cash at any point in the future will go toward the additional payment of Claims because, as COLLIER makes clear, the Debtor must be allowed to retain sufficient funds with which to operate, make necessary improvements, and maintain its facilities. COLLIER ¶ 943.03[7][a]. Indeed:

> [t]he primary purpose of debt restructure for a municipality is *not future profit*, *but rather continued provision of public services*. The insolvency test measures whether a municipality can pay for the services it provides. Since insolvency is the foundation of Chapter 9 eligibility, it would make little sense to confirm a reorganization plan which does not remedy the problem. Stated differently — *there is no purpose in confirming a Chapter 9 plan if the municipality will be unable to provide future governmental services*.

*In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999) (emphasis added).

Municipalities are ineligible for court-supervised liquidation under Chapter 7 so Creditors of the Hospital would have only state law rights in the event this Case is dismissed. One California bankruptcy court has noted: "In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds." *County of Orange v. Merrill Lynch & Co. (In re County of Orange)*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996); COLLIER ¶ 943.03[7][a] (16th ed.).

Here, the Plan reasonably compensates and provides the best recovery for Creditors in the circumstances and the maximum that the Debtor is able to pay while maintaining its mission of continuing to provide health care services to

Hardeman County and its needy inhabitants. The Debtor's Business Plan and the testimonies of Dave Clark, its Chief Executive Officer, Tracy Betts, its Chief Financial Officer, and Brent Fuller, its accountant and consultant, have established that the projected cash balances at future points in time are uncertain and subject to variance, especially in the current healthcare environment in which the Affordable Care Act has injected sweeping changes, and such funds are likely to be needed to pay costs of providing medical services to the residents, including needy inhabitants, of the Debtor's district, the salaries of the medical staff and employees, and the costs of maintenance of the physical plant and the equipment. In fact, as stated in the testimony of Brent Fuller at the Confirmation Hearing, the Debtor operates with a significantly smaller amount of cash on hand and a far leaner staff than do its peers. Specifically, the Debtor operates with approximately half of the cash on hand compared to its peer hospitals.  In addition, the Debtor has capital needs, specifically to replace and upgrade numerous pieces of equipment, which are itemized on Exhibit B to the Disclosure Statement. In light of those circumstances, the amounts of Cash proposed to be paid to satisfy Secured Claims of Creditors in Classes 1 through 4 and in the two Classes of General Unsecured Claims, Classes 5 and 6, is justified and appropriate under the facts of this Case. The Court will not second-guess the political discretion and governmental decision-making of the Debtor's governing board in the determination of these amounts.

Accordingly, the circumstances of the Debtor's Chapter 9 Case support Confirmation of the Plan as fair and equitable over the will of dissenting Class 5

Creditors. No viable alternative to the Plan exists that would resolve the Debtor's insolvency and provide a greater recovery to the objecting and the rejecting Creditors in Class 5. In reaching this conclusion, the Court has relied on the credible testimony of all five witnesses at the Confirmation Hearing: Dave Clark, Interim CEO; Tracy Betts, CFO; Brent Fuller, the Debtor's outside CPA; Ronald Ingram, the Hardeman County Judge; and Wiley Tabor, the Chairman of the Hardeman County Hospital District Board of Directors.

(l)     **Bankruptcy Code § 1142(b)**. Pursuant to Bankruptcy Code § 1142(b), Articles VI and VII of the Plan provide for the Debtor and any other necessary Persons to execute or deliver, or join in any instrument required to perform any act, including the satisfaction of any lien, that is necessary for the consummation of the Plan.

14.     **Bankruptcy Code § 943(b)(2)**. As required by Bankruptcy Code § 943(b)(2), the Plan complies with the relevant provisions of Chapter 9 of the Bankruptcy Code, as follows:

(a)     **Bankruptcy Code § 941**. In accordance with Bankruptcy Code § 941, the Debtor properly filed the Plan to adjust its debts. *See* COLLIER ¶ 941.02.

(b)     **Bankruptcy Code § 942**. Section 942 is not applicable.

(c)     **Bankruptcy Code § 944**. In accordance with Bankruptcy Code § 944(a), the provisions of the Plan shall bind the Debtor and any Creditor, (i) whether or not such Creditor's claim was filed or deemed filed under Bankruptcy Code § 501, (ii) whether or not such Claim is allowed under Bankruptcy Code § 502,

or (iii) whether or not such Creditor has accepted the Plan. Under Bankruptcy Code § 944(b), the Debtor shall be discharged from all of its debts as of the time when (x) the Plan is confirmed, (y) the Debtor has deposited the consideration to be distributed under the Plan to Classes 5 and 6 with the Disbursing Agent, and (z) the Order Confirming Plan is entered, which shall constitute a determination by this Court that such provisions made to pay or secure payment of such obligation are valid.

(d) **Bankruptcy Code § 945**. Under Bankruptcy Code § 945, the Plan properly provides that this Court retains jurisdiction over the Case after Confirmation in order to ensure the successful implementation of the Plan.

15. **Bankruptcy Code § 943(b)(3)**. Bankruptcy Code § 943(b)(3) requires that all amounts to be paid by the Debtor for services and expenses of professionals in the Case or incident to the Plan have been disclosed by those professionals to the Court. Such amounts have been properly disclosed in the Disclosure Statement, and the Court hereby finds that such amounts are reasonable. Any unpaid Professional Fees owed by the Debtor may be paid on or as soon as is reasonably practicable following the date of entry of the Order Confirming Plan, or at such other time as may be agreed upon in writing by such professionals and the Debtor. In the ordinary course of business, the Debtor may pay for professional services rendered and expenses incurred after the Effective Date.

16. **Bankruptcy Code § 943(b)(4).** In compliance with Bankruptcy Code § 943(b)(4), the Debtor is not prohibited by law from taking any action necessary to carry out the Plan.

17. **Bankruptcy Code § 943(b)(5).** As required by Bankruptcy Code § 943(b)(5), except to the extent, if any, that a Holder has agreed to different treatment of its Claim, the Plan provides that each Holder of an Administrative Claim under Bankruptcy Code § 507(a)(2) will receive Cash on account of such Claim equal to the allowed amount of such Claim on the Effective Date, or as soon as reasonably practicable thereafter; or if the Administrative Claim has not been allowed as of the Effective Date, within ten (10) Business Days after the date such Claim has been Allowed by Final Order of this Court.

18. **Bankruptcy Code § 943(b)(6).** In accordance with Bankruptcy Code § 943(b)(6), the Plan provides as a condition to its effectiveness that the Debtor shall have obtained any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the Plan, or such Plan provision is expressly conditioned upon such approval being obtained. The evidence presented at the Confirmation Hearing indicates that no such approval is necessary.

19. **Bankruptcy Code § 943(b)(7).** It is this Court's judgment that the Plan is in the best interests of Creditors and is feasible.

20. The Plan is in the best interests of Creditors because it provides Creditors, as a whole, with a better alternative than dismissal of the Chapter 9

**ORDER CONFIRMING PLAN OF ADJUSTMENT**                    Page 23 of 44

Case and indeed provides all that Creditors can reasonably expect under the circumstances. In Chapter 9, Creditors cannot expect that, in making payments to Creditors under a plan, all of the Debtor's excess cash will go toward the payment of Claims because the Debtor must be allowed to retain sufficient funds with which to operate, make necessary improvements, and maintain its facilities. COLLIER ¶ 943.03[7][a]. Indeed: "[T]here is no purpose in confirming a Chapter 9 plan if the municipality will be unable to provide future government services." *In re Mount Carbon Metro. Dist.*, 242 B.R. at 34.

21.     Municipalities are not eligible for court-supervised liquidation under Chapter 7 of the Bankruptcy Code, and, accordingly, Creditors have only state law rights in the event a Chapter 9 plan of adjustment is not confirmed. A bankruptcy court in California found: "In the [C]hapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds."*County of Orange v. Merrill Lynch & Co., Inc. (In re Cnty. of Orange)*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996). In the event of dismissal of this Case, such chaos would ensue, and the Debtor would face substantial unpaid debts and millions of dollars in asserted liabilities that have been otherwise settled in the many settlements that have taken place during the Case or satisfied in full by the Plan. Moreover, "of particular importance to the Court is that the Plan preserves the availability of healthcare services to citizens and patients" in Hardeman County. *In re Barnwell Cnty. Hosp.*, 471 B.R. at 869. Yet another case observed that a Chapter 9 plan is in the best interests of creditors

because the alternative of dismissal would allow those creditors that would be able most promptly to obtain judgments on their claims to benefit at the expense of others and also because the plan preserved the availability of healthcare services to local citizens. *In re Bamberg Cnty. Mem'l Hosp.*, No. 11-03877, 2012 WL 1890259, at *8 (Bankr. D.S.C. May 23, 2012). Finally, an opinion in a closely analogous Chapter 9 case considered in its § 943(b)(7) analysis that "the hospital is very important to the community" and is an "essential element" to community survival. *In re Corcoran Hosp. Dist.*, 233 B.R. at 454. Were the Case to be dismissed, the Debtor's ability to effectively continue to serve its mission of providing health care services to the citizens of Hardeman County, including its needy inhabitants, would be seriously threatened at a minimum.

22. The Debtor's three-year Business Plan, which is attached to the Disclosure Statement as Exhibit C, sets forth the Debtor's best estimates of all funds expected to be or become available to the Debtor from proceeds of its medical services and Hospital operations and revenues of its property taxation. The Debtor has formulated its Plan and determined the amount of those distributions to Creditors under the Plan based upon those estimates. Although TMJMF and InterEXPO asserted that the Debtor should raise its tax rate to obtain more money with which to pay General Unsecured Creditors, the credible evidence at the Confirmation Hearing is that the Debtor is not in a position to raise taxes because of property values and economic conditions; and the taxpayers of the county are already paying the maximum the taxpayers will permit. The exhibits and the

testimony at the Confirmation Hearing bear this out. The Board has maintained a steady amount of tax revenues since 2010 and during the Case. The Board of Directors of the Debtor has properly exercised its governmental discretion and decision-making with respect to the tax rate.

23.    Other bankruptcy courts have not required Chapter 9 debtors to raise taxes in connection with confirmation of a Chapter 9 plan. For instance, in the face of a creditors' committee arguing that a Chapter 9 hospital district debtor must be required to raise taxes in order to pay off its debts under its plan of adjustment, the bankruptcy court in *Corcoran Hosp. Dist.*, 233 B.R. at 453 & 459, did not require the hospital district in that case to increase taxes; it would have been a "futile exercise" in light of the hospital district's demographics and economic issues. Specifically, the court explained that it "found that the debtor Hospital District could not raise taxes sufficient to pay more to Class 5." *Id.* at 461. Likewise, the Court in this Case should not require the Debtor to increase taxes where the valuation of taxable properties has substantially declined in the past year and taxpayer sentiment is strongly opposed to increasing the amount of the Hospital's tax revenue.

24.    Similarly, in the *City of Detroit* Chapter 9 case, the bankruptcy court considered arguments of "some creditors that the City could pay them more by raising taxes." *In re City of Detroit*, 524 B.R. at 213. But, the court there explained that "[t]he Supreme Court has described the right to compel a municipality to raise taxes to satisfy judgments against it as an 'empty right to litigate,' particularly in

times of economic crisis.'" *Id.* at 214 (quoting *Faitoute Iron & Steel*, 316 U.S. 502, 510 (1942)). In *Detroit*, as in this Case, "[t]he evidence establishes that raising tax rates is not a viable option for the [municipality], legally or practically" where there was testimony from the mayor that neither the people of the city nor the state legislature would vote to increase taxes and where the emergency manager for the city testified that the city is at "tax saturation and that raising taxes would likely add to the population decline." *Id.* at 216. The court further explained that "creditors as a whole" must be benefitted by the plan, not just a single creditor who could win the "proverbial race to the courthouse" if the case were to be dismissed (noting that liquidation is not an option in Chapter 9). *Id.* at 216-17. Further bolstering its conclusion, the *Detroit* court explained:

> There is no more money available for creditors in the City's already tight budget projections. Every dollar is accounted for in providing necessary services, in implementing the necessary RRIs [reinvestment and restructuring initiatives], and in meeting plan obligations. All of those cash uses are essential to the City's future. In this plan, the floor of the best interest test and the ceiling of the feasibility test have, for all practical purposes, converged.

*Id.* at 219. Moreover, the court continued:

> Consistent with (or perhaps required by) [the Tenth A]mendment], § 903 provides that chapter 9 "does not limit or impair the power of a State to control, by legislation or otherwise, a municipality . . . in the exercise of the political or governmental powers of such municipality." 11 U.S.C. § 903. Whether for clarity or emphasis, § 904 underscores that restriction on this Court's authority by providing, "Notwithstanding any power of the court, . . . the court may not . . . interfere with" a chapter 9 debtor's property, revenue, or use thereof, or with any of its "political or governmental powers." 11 U.S.C. § 904.

*Id.* at 250. Indeed, "it is for the City, not this Court, to supervise the execution of [its] recovery." *Id.* at 251. The State of Texas has filed a statement of support for Confirmation of the Plan, noting its compliance with § 904.

25.    The Business Plan additionally supports the conclusion that the Plan is feasible within the contemplation of Bankruptcy Code § 943(b)(7). In order to meet the feasibility requirement in Chapter 9, the Debtor must be able to have a reasonable prospect of successfully implementing the Plan while continuing to provide government services. *See Mount Carbon Metro. Dist.*, 242 B.R. at 35; *Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.)*, 429 B.R. 692, 711 (Bankr. C.D. Cal. 2010) (Chapter 9 plan is feasible where it "offers a reasonable prospect of success and is workable"). On the Effective Date, it is more likely than not that the Debtor will be able to make the payments contemplated by the Plan and, at the same time, sustainably continue to provide medical care services to Hardeman County. The payments contemplated by the Plan have been carefully considered by the Debtor and its advisors, and Court finds that the making of such payments is feasible. Furthermore, the Court finds that the conditions to the Effective Date set forth in § 6.04 of the Plan are reasonably likely to be satisfied. Thus, the Debtor has demonstrated a reasonable prospect that it will be able to successfully implement the Plan. Under all the circumstances presented in the record of this Case and the evidence presented at the Confirmation Hearing, this Court finds that the Plan is in the best interest of Creditors and is feasible.

## Approval of Settlements and Compromises

26.     The Supreme Court has long recommended settlements in bankruptcy

cases: "Compromises are a normal part of the process of reorganization." *Protective*

*Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,

390 U.S. 414, 424 (1968). The *TMT* decision came up from the Fifth Circuit, which

has ever since had the leading published jurisprudence in the nation on the topic of

approval of settlements in bankruptcy cases, and which very recently reconfirmed

the evaluative standards:

> A bankruptcy court may approve a compromise or settlement . . .
> pursuant to Rule 9019, but it should do so "only when the settlement is
> fair and equitable and in the best interest of the estate." In
> determining whether a settlement is fair and equitable, we apply the
> three-part test set out in *Jackson Brewing* with a focus on comparing
> "the terms of the compromise with the likely rewards of litigation." A
> bankruptcy court must evaluate: (1) the probability of success in
> litigating the claim subject to settlement, with due consideration for
> the uncertainty in fact and law; (2) the complexity and likely duration
> of litigation and any attendant expense, inconvenience, and delay; and
> (3) all other factors bearing on the wisdom of the compromise. These
> "other" factors—the so-called *Foster Mortgage* factors—include: (i) "the
> best interests of the creditors, 'with proper deference to their
> reasonable views'"; and (ii) "'the extent to which the settlement is truly
> the product of arms-length bargaining, and not of fraud or collusion.'"

*Off. Comm. of Unsec. Creds. v. Moeller (In re Age Refining, Inc.)*, 2015 WL 5449203,

at *6 (5th Cir. Sept. 16, 2015); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th

Cir. 1980); *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg.*

*Co.)*, 68 F.3d 914, 917 (5th Cir. 1995).

27.     The following settlements and compromises embodied in the Plan

satisfy the fair and equitable requirement and are approved in all respects as good

faith, fair, reasonable, and equitable compromises and settlements of the disputes and contract issues with the following parties, and such settlements and compromises are in the best interests of the Debtor, its Creditors, and its inhabitants:

    (a)    **Settlement with Hardeman County on EMS Contract**. The Debtor compromises and settles the mutual claims of Hardeman County and the Debtor with respect to the executory contract concerning emergency medical services. The Debtor will enter into a new contract with the Hardeman County pertaining to ambulance and emergency service within the county, the payments to the Debtor therefor, and the resolution of the prepetition claim of the County. In connection with the execution of the contract, the County of Hardeman withdraws its Proof of Claim No. 56 in the amount of $7,829.25.

    (b)    **Settlement with Otis Elevator on Elevator Contract**. The Debtor compromises and settles the mutual claims of Otis Elevator ("**Otis**") and the Debtor with respect to the prepetition executory contract titled Examination and Lubrication Service Agreement (the "**Old Contract**"). The Debtor owes Otis $316.89 for prepetition services rendered under the Old Contract and $1,512.94 for postpetition services rendered under the Old Contract. The Debtor intended to reject the Old Contract under Bankruptcy Code § 365, but instead the parties have agreed to waive prepetition amounts owed by the Debtor and to accept a one-time reduced payment of $1,011.06 for postpetition services rendered under the Old Contract; and the Debtor and Otis shall enter into a new contract relating to

maintenance and service of the Hospital's elevator and to release one another from all claims relating thereto.

28.     The Order Confirming Plan shall constitute approval of each of the settlements and compromises under Bankruptcy Rule 9019 and the Fifth Circuit standards. The Debtor is authorized to take any and all actions necessary or appropriate to perform under or implement the terms of each.

### Approval of Exculpation, Release, Discharge, and Injunctive Provisions

29.     The discharge provision set forth in § 11.01, the injunctive provisions set forth in § 11.02, and the settlement and release of claims provision set forth in § 11.05 of the Plan are consistent with the provisions of Chapter 9 of the Bankruptcy Code, are approved, and shall be effective on the Effective Date of the Plan.

30.     As announced on the record at the Confirmation Hearing, this Court directed the redrafting of the exculpation provision in § 11.04 of the Plan to comply with *Bank of N.Y. Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009) ("***Palco***"). The revised exculpation provision, which shall replace § 11.04 of the Plan, is as follows and is also included in the Order Confirming Plan:

> From and after the Effective Date, to the fullest extent permitted under applicable law, and except as expressly set forth herein, the Debtor shall not have or incur any liability, whatsoever, to any Person for any act or omission in connection with, relating to, or arising out of the Debtor's restructuring efforts or the chapter 9 Case; however, the foregoing otherwise broad exculpation shall

> not affect the liability of the Debtor that otherwise would
> result from any act or omission to the extent that such act
> or omission is determined in a Final Order to have
> constituted gross negligence or willful misconduct. The
> Debtor shall be entitled to rely upon the advice of counsel
> and financial advisors with respect to its duties and
> responsibilities under, or in connection with, the Case, the
> administration thereof, and this Plan.

The revised § 11.04 contains no release of third parties from any liability for any acts or omissions related to the Case, and, accordingly, it is consistent with *Palco*.

31. As provided in the Plan, the automatic stay of Bankruptcy Code §§ 362(a) and 922(a) and any injunction or other stay arising under or entered during the Case under Bankruptcy Code § 105 or otherwise that is in existence on the Confirmation Date shall remain in full force and effect until the later of the date of the closing of the Case or any date indicated in the Order providing for such injunction or stay.

### Order Confirming Plan to Be Binding on All Parties

32. Subject to § 6.04 of the Plan, in accordance with § 944(a) of the Bankruptcy Code, and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan, these findings and conclusions, and the Order Confirming Plan shall be binding upon, and inure to the benefit of: (a) the Debtor; (b) any and all Holders of Claims (irrespective whether (i) any such Claim is impaired under the Plan; (ii) proof of any such Claim has been filed or deemed filed under § 501 of the Bankruptcy Code; (iii) any such Claim is allowed under § 502 of the Bankruptcy Code; or (iv) the Holders of such Claims

accepted, rejected, or are deemed to have accepted or rejected the Plan); (c) any Person giving, acquiring, or receiving property under the Plan; (d) any and all non-Debtor parties to Executory Contracts or Unexpired Leases of the Debtor; (e) any party to any Settlement or Compromise; (f) the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors, or assigns, if any, of any of the such parties. All settlements, compromises, releases, waivers, discharges, exculpations, and injunctions set forth in the Plan shall be operative, effective, and binding on all Persons who may have standing to assert any settled, released, discharged, exculpated, or enjoined causes of action, and no other Person or entity shall possess such standing to assert such causes of action after the Effective Date. The compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Person in any court or other forum.

### Retention of Property and Release of Liens

33.     Except as otherwise expressly provided in the Plan, all property and interests in property of the Debtor shall be retained by the Debtor on the Effective Date, free and clear of all Claims, liens, encumbrances, charges, and interests. From and after the Effective Date, the Debtor may conduct its affairs and use, acquire, and dispose of any assets or property without supervision by or approval of this Court and free of any and all restrictions of the Bankruptcy Code or Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Order

Confirming Plan. Except as otherwise provided in the Plan, any Person having a lien, Claim, or other interest against the Debtor's assets shall be conclusively deemed to have consented to the re-vesting of such assets in the Debtor upon the Effective Date free and clear of such lien, Claim, or other interest by failing to object to the Confirmation of the Plan.

### Executory Contracts and Unexpired Leases

34. The executory contract and unexpired lease provisions of Article X of the Plan are approved.

35. The executory contracts and unexpired leases identified on the Plan's **Exhibit A** constitute the Assumed Contracts that are assumed by the Debtor. All such contracts and leases not assumed are rejected as of the Effective Date. The Plan serves as a motion for an order approving the assumption of the Assumed Contracts by the Debtor on the Effective Date. Except to the extent (a) the Debtor has previously assumed or rejected an executory contract or unexpired lease, (b) prior to the Effective Date, this Court entered an Order granting assumption of an executory contract or unexpired lease, (c) at the Confirmation Hearing, this Court approved the assumption of an executory contract or unexpired lease, or (d) an executory contract or unexpired lease is set forth on Exhibit A to the Plan, all other of the Debtor's executory contracts and unexpired leases shall be rejected on the Effective Date under Bankruptcy Code §§ 365, 901, and 1123.

36. The assumption by the Debtor of the Assumed Contracts, and the proposed cure amounts relating to each Assumed Contract, which are specified in

Exhibit A of the Plan, are hereby approved as of the Effective Date. Any Objections to any of the assumptions or to any proposed cure amounts are hereby overruled. Any Claims for Cure Amounts relating to the assumption of an Assumed Contract and ordered to be paid by this Court shall be paid by the Debtor on, or as soon as reasonably practicable after, the Effective Date. Such Claims for Cure Amounts shall be satisfied in full and shall be deemed in final satisfaction of all defaults, including arrearages, under the Assumed Contracts as of the Effective Date. As of the Effective Date, the Debtor shall be relieved and discharged from any liability arising on or before the Effective Date under the Assumed Contracts other than the obligation to satisfy Claims for Cure Amounts and to perform such agreements henceforth.

37. Non-Debtor counterparties to executory contracts and unexpired leases that are deemed rejected on the Effective Date have until the Rejection Damages Bar Date, which shall be the first Business Day that is at least thirty (30) Business Days after the Effective Date, to file Claims with this Court asserting any Claims for rejection damages; however, if a prior Final Order if this Court approved the rejection of an executory contract or unexpired lease during the Case, any bar date set forth in such order shall be applicable and shall control as to such previously-rejected executory contract or unexpired lease. Any Claims for rejection damages that are not filed by the applicable Rejection Damages Bar Date are forever barred and discharged without any further order of this Court being required.

38.    Although the Debtor is party to executory contract(s) with CSS Health Technologies, a Tennessee corporation, its successors or assigns ("**CSS**"), described as or titled "Purchase and License Agreement (with Schedule A)," "Company Software Support Agreement," and "Hardware Support Agreement," or howsoever the contractual relationship of the Debtor and CSS may be documented, such contract(s) are neither assumed or rejected by the Debtor in this Case; rather, such contract(s) shall ride through the Case and shall be unaffected by the provisions of the Plan as set forth in § 10.03 of the Plan. *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 404-05 (5th Cir. 2001); *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 n.4 (5th Cir. 2000); *In re Greystone III Joint Venture*, 995 F.2d at 1281; *Texaco Inc. v. Bd. of Comm'rs (In re Texaco Inc.)*, 254 B.R. 536, 556-58 (Bankr. S.D.N.Y. 2000). The Debtor believes that CSS has not performed or may not perform its obligations under such contract(s) while the Debtor has made payments to CSS totaling approximately $436,032.38 plus approximately $280,000.00 from July 2013 through August 31, 2015 in monthly support fees, and the Debtor has performed its obligations. Ride through of the executory contract(s) with CSS is, therefore, justified and appropriate as proposed by the Debtor.

## Plan Distributions

39.    On and after the Effective Date, Distributions on account of Allowed Claims under the Plan, and the resolution and treatment of Disputed Claims, shall be effectuated pursuant to Articles IV, VII, VIII, and IX of the Plan.

**Claims Bar Dates and Related Matters**

40.    Unless otherwise provided in the Plan or in an Order of this Court, or agreed to expressly and in writing by the Debtor, any Claim that is not timely filed shall not be treated as an Allowed Claim for all purposes (including voting and distribution) under the Plan, whether or not an objection to such Claim has been filed, and such Claims shall be forever barred and discharged upon the occurrence of the Effective Date.

41.    The Bar Date for Creditors to file Proofs of Claims in this Case was July 19, 2013 for non-governmental entities and September 17, 2013 for governmental entities. Any Proofs of Claim that are Filed after the applicable Bar Date, including amendments to existing Proofs of Claim, and any applications for the allowance of any Administrative Claims that are Filed after the Administrative Claims Bar Date, are forever barred and discharged unless consented to by the Debtor in writing or expressly authorized by Order of this Court.

42.    The 503(b)(9) Bar Date was July 18, 2014 at 5:00 p.m. Each Holder of an Administrative Claim asserted under Bankruptcy Code § 503(b)(9) must have filed any asserted 503(b)(9) Claims in accordance with the 503(b)(9) Procedures by the 503(b)(9) Bar Date. Any 503(b)(9) Claims not filed in accordance with the 503(b)(9) Procedures by the 503(b)(9) Bar Date are forever barred and discharged. Unless the Holder of an Allowed § 503(b)(9) Claim has agreed to different treatment, the Debtor shall pay to such Holder the Allowed amount of such

§ 503(b)(9) Claim, without interest, on the Effective Date, or as soon as reasonably practicable thereafter.

43. Except as otherwise provided in the Plan, the Holder of an Allowed Administrative Claim, in full satisfaction and discharge of, and in exchange for such Claim, shall, to the extent not already paid during the pendency of the Case, (a) be paid by the Disbursing Agent the full amount of such Allowed Administrative Claim, without interest, on or before the later of (i) the Effective Date of the Plan or (ii) ten (10) Business Days after the date such Claim is Allowed by Final Order or (b) receive such other less favorable treatment as may be agreed upon in writing by such Holder and the Debtor. Notwithstanding the foregoing, any Administrative Claim based upon liability incurred by the Debtor in the ordinary course of business during the Case may be paid by the Debtor under its authority preserved by Bankruptcy Code §§ 903 and 904 in the ordinary course of business, in accordance with the terms and conditions of any agreement related thereto or upon such other terms as may be agreed upon between the Holder of such Claim and the Debtor, without application by or on behalf of such parties to this Court, and without notice and a hearing, unless specifically required by this Court.

44. Each Holder of an Administrative Claim (*other than* any Administrative Claims paid in the ordinary course of business pursuant to § 2.01 of the Plan, § 503(b)(9) Claims, Claims for Cure Amounts, Professional Fees, or any FNB Postpetition Credit Facility Claim) shall File with this Court, and serve upon all parties required to receive notice, a motion explaining the factual and legal bases

for and requesting allowance of such Administrative Claim on or before the Administrative Claims Bar Date. The failure to timely File such a motion on or before the Administrative Claims Bar Date, which is the first Business Day that is at least sixty (60) calendar days after the Effective Date, will result in such Administrative Claim being forever barred and discharged without any further order of this Court being required. The Debtor or other party in interest may File an objection to such motion for allowance of any Administrative Claims within sixty (60) calendar days after the expiration of the Administrative Claims Bar Date, unless such time period for filing any such objection is extended by this Court. Any such Administrative Claim shall only be an Allowed Administrative Claim upon entry of, and to the extent granted by, a Final Order by this Court finding that such asserted Administrative Claim is an Allowed Claim.

45.    As set forth in the subsection of these findings and conclusions entitled Executory Contracts and Unexpired Leases, and as defined in the Plan, the Rejection Damages Bar Date is the first Business Day that is at least thirty (30) Business Days after the Effective Date, unless an earlier date otherwise has been specified in a Final Order of this Court relating to the rejection of an executory contract or unexpired lease during the Case.

### Plan Implementation

46.    Pursuant to and for purposes of Bankruptcy Code § 904, the Debtor has consented to entry of these findings and conclusions and the Order Confirming Plan on the terms and conditions set forth in the Plan and to entry of any further

orders as necessary or required to implement the provisions of the Plan or any and all related transactions.

47. As of the Effective Date, the Debtor shall retain and have all the rights, powers, and duties necessary to carry out its responsibilities under the Plan and as may be otherwise provided in these findings and conclusions or the Order Confirming Plan.

48. On and after the Effective Date, the Debtor, as Disbursing Agent, shall carry out the administration of the Plan, including the disbursement of Distributions to be paid to Holders of Claims under the Plan. The Order Confirming Plan shall serve as the appointment by this Court of the Debtor as Disbursing Agent in compliance with the requirement of the appointment of a "disbursing agent" in accordance with Bankruptcy Code § 944(b)(2) and as set forth in § 7.02 of the Plan.

49. On and after the Effective Date, the Debtor shall have the right to retain the services of and pay the fees and expenses of attorneys, accountants, and other professionals that, in their sole discretion, are reasonable and necessary to assist them in the performance of their duties with respect to the Plan. The reasonable fees and expenses of such professionals may be paid as they are invoiced in the ordinary course of business of the Debtor and shall not be subject to further approval of this Court.

50. All post-confirmation costs, expenses, and obligations incurred by the Debtor in administering the Plan, in any manner connected, incidental, or relating

to such administration, or in effecting Distributions from the Debtor thereunder (including the reimbursement of reasonable expenses) shall be a charge against the property of, and owed by, the Debtor. Such expenses shall be paid in the ordinary course of business of the Debtor as they are incurred without the need for further approval of this Court.

## Binding Effect of Prior Orders

51.    Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and the terms of the Plan, these findings and conclusions, and the Order Confirming Plan, all prior orders entered in the Case, all documents and agreements executed by the Debtor as authorized and directed thereunder, and all motions or requests for relief by the Debtor pending before this Court as of the Effective Date, shall be binding upon and shall inure to the benefit of the Debtor and any other parties expressly subject thereto.

## Patient Care Ombudsman

52.    Upon the Effective Date of the Plan, the Patient Care Ombudsman, who was appointed by this Court on April 23, 2013 pursuant to Bankruptcy Code § 333, shall be released and fully discharged of her duties in this Case.

## In the Event of Reversal

53.    If any or all of the provisions of these findings and conclusions or the Order Confirming Plan were to be stayed, reversed, modified, or vacated by subsequent order of this Court or any other federal appellate court with appropriate jurisdiction, such stay, reversal, modification, or vacatur shall not affect the validity

of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtor's receipt of written notice of such order. Notwithstanding any such stay, reversal, modification, or vacatur of these findings and conclusions or the Order Confirming Plan or any of these findings and conclusions, any such act or obligation incurred or undertaken pursuant to, and in reliance on, these findings and conclusions or the Order Confirming Plan prior to the effective date of such stay, reversal, modification, or vacatur shall be governed in all respects by the provisions of these findings and conclusions, the Order Confirming Plan, and the Plan and all related documents or any amendments or modifications thereto.

## Notices of Order Confirming Plan and of Effective Date

54.     In accordance with Bankruptcy Rule 3020(c)(2), the Debtor shall mail or cause to be mailed notice of the entry of the Order Confirming Plan, promptly after its entry, to all Creditors and parties in interest in the Case.

55.     On or before five (5) Business Days after the occurrence of the Effective Date, the Debtor shall mail or cause to be mailed to all Creditors and parties in interest in this Case a Notice of Effective Date that informs such Persons of (a) entry of the Order Confirming Plan; (b) the occurrence of the Effective Date; (c) the assumption and rejection of executory contracts and unexpired leases of the Debtor as well as the deadline and procedures for the filing of Claims arising from any such rejection; (d) the deadline and procedures for filing of Administrative Claims; and (e) any other such matters the Debtor deems appropriate.

## No Diminution of State Power

56.    No term of the Plan shall be construed: (1) to limit or diminish the power of the State of Texas to control, by legislation or otherwise, (a) the Debtor in the exercise of political or governmental powers or (b) the Debtor's provision of healthcare-related services or any other activities or matters subject to the regulatory agencies of the state; or (2) as a waiver by the State of Texas of its rights as a sovereign state and the rights reserved for it in the Tenth Amendment of the Constitution.

## Retention of Jurisdiction

57.    Under Bankruptcy Code §§ 105(a) and 945, and notwithstanding entry of the Order Confirming Plan and occurrence of the Effective Date, this Court shall retain exclusive jurisdiction over all matters arising out of and related to the Case or the Plan to the fullest extent permitted by law, as is necessary for the successful implementation of the Plan, including, among other things, jurisdiction as set forth in Article XII of the Plan.

## Conclusion

The Court reserves the right to make further findings and conclusions. Any finding of fact that constitutes a conclusion of law shall be so construed and vice versa.

An Order Confirming Plan will be separately entered.

### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ###

Submitted by:

*/s/ Josiah M. Daniel, III*
Josiah M. Daniel, III, SBT # 05358500
Matthew W. Moran, SBT # 24002642
Katherine D. Grissel, SBT # 24059865
**VINSON & ELKINS L.L.P.**
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel: 214.220.7718  Fax: 214.999.7718
jdaniel@velaw.com; mmoran@velaw.com;
kgrissel@velaw.com

**ATTORNEYS FOR THE DEBTOR**